**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **MICHAEL COLWELL AND JULIA COLWELL H/W**<br><br>Waterford, NY 12188<br><br>v.<br><br>**SIG SAUER, INC.**<br>72 Pease Boulevard<br>Newington, NH 03801 | **CIVIL CASE NUMBER:** 1:21-CV-1200 (TJM/ML)<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs, Michael Colwell and Julia Colwell, by and through their counsel, hereby state the following Complaint in Civil Action against the above-captioned Defendant and, in support thereof, aver as follows:

## SUMMARY AND NATURE OF ACTION

1.      Plaintiff, Michael Colwell, is an adult individual, citizen, and resident of the State of New York, residing at the above captioned address.

2.      Plaintiff, Julia Colwell, is an adult individual, citizen, and resident of the State of New York, residing at the above captioned address.

3.      This action seeks actual, compensatory, and punitive damages, and equitable relief, relating to Defendant, SIG Sauer Inc.'s (hereinafter "Defendant", "Sig" or "Sig Sauer"), negligence, defective design, breach of warranties and unfair and deceptive marketing practices regarding a semi-automatic gun.

4.      Specifically, this matter involves a striker-fired, semi-automatic pistol known as the "P320" that has fired without trigger pulls on numerous civilians and law enforcement agents across the nation and throughout the world.

5.      Prior to this incident, Defendant received multiple complaints and notifications of P320 pistols firing without trigger pulls.

6.      Colwell, a resident of New York, was issued a SIG Sauer P320 in connection with his duties as an officer in the police department for the City of Troy in New York.

7.      Prior to June 2, 2021, Colwell had performed firearms training with the subject P320 in New York.

8.      Prior to June 2, 2021, Colwell was required to have on his person the subject P320 in connection with his job responsibilities in New York.

9.      Colwell's P320 should not have discharged without the trigger being pulled, holstered or un-holstered.

10.     In its "Safety Without Compromise" marketing materials for the P320, SIG states:



SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

11.     Despite this express representation, which SIG has made for the last several years to the present, the weapon fired without the trigger being pulled.

12.     Plaintiffs bring causes of action under New York law for negligence, strict products liability, breach of express warranty, breach of implied warranty, and negligent and intentional infliction of emotional distress in view of Sig's misrepresentations about the safety of the weapon.

13.     Defendant, SIG, had knowledge long before this sale that the P320--its first ever striker-fired pistol--was capable of firing by itself without the trigger being pulled due to defective striker-sear components inside the weapon's slide.

14.     For many years since the weapon was first introduced to the market in 2014, SIG has recklessly failed to recall it despite knowing of many grievous wounds inflicted upon law enforcement.

## JURISDICTION

15.     Jurisdiction is founded on diversity of citizenship pursuant to 28 U.S.C. § 1332.

16.     Defendant has a principal place of business in New Hampshire and, accordingly, is a citizen of New Hampshire.

17.     Defendant SIG does business in and is subject to personal jurisdiction in this judicial district. Defendant has registered to do business in the state of New York and therefore is subject to both general jurisdiction and specific jurisdiction due to its conduct and actions within the state.

18.     The amount in controversy substantially exceeds, exclusive of interest and costs, $75,000.

## VENUE

19.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2).

20.     Plaintiff is a 43-year-old resident of New York who is licensed to carry concealed weapons.

## ALLEGATIONS

21.     Plaintiff has substantial firearms experience and was issued this gun for his job responsibilities in New York.

22.     Plaintiff has suffered permanent physical injury and disfigurement as a direct and proximate result of the negligence and breach of warranties and deceptive marketing practices of SIG.

23.     For the last twelve (12) years, Colwell has served as a police officer with the City of Troy Police Department.

24.     Defendant designs and manufactures firearms for sale to military and commercial markets in the State of New York, throughout the United States, and internationally. It markets and sells its products directly and through dealers.

25.     Defendant was formerly known as SIGARMS, Inc. and changed its name to SIG Sauer, Inc. in October 2007. The company was founded in 1985 and has its principal place of business in Exeter, New Hampshire.  Its Chief Executive Officer at all times relevant to this Complaint was Ron J. Cohen.

26.     On June 2, 2021, Colwell was participating in a firearms training exercise at their range in New York.

27.     Colwell, along with a fellow officer, was performing a room clearing drill with Colwell's service-issued P320 and live ammunition.

28.     As part of the drill, Colwell and his fellow office conducted a simulated clearing of two rooms without incident.

29.     After entering the third room, Colwell placed his P320 in a holster on his right hip with his right hand, then reached across his body with his right hand to draw a simulated taser.

30.     When Colwell reached across his body to retrieve his simulated taser, the P320 discharged from within its holster.

31.     Colwell never touched the P320's trigger.

32.     Colwell's finger could not have touched the P320's trigger while it was holstered.

33.     The bullet struck Colwell in his upper right thigh, travelled through his quad muscle, and exited above his right knee, causing substantial injury, maceration of tissue, blood loss, and nerve damage.

34.     While the full extent of the physical damage to his leg is not yet known, he has had and it is likely that he will have trouble running, sitting, or standing as he had before the incident, and may not be able to return to this position as a result of diminished physical capacity to perform his job.

35.     As a direct and proximate result of Defendants' negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Colwell was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Colwell has in the past and is reasonably likely to require medicines, medical care and treatment.  Mr. Colwell has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Colwell has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Colwell has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Colwell's great loss and detriment.

The incident has resulted in substantial physical harm and related trauma to Colwell, who has received substantial and ongoing treatments and medicines.

36.     Years before the incident occurred, through and including the date of the incident, SIG expressly represented that the weapon could not fire without a trigger pull: "[w]e've designed safety elements into every necessary feature on this pistol.  From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to":



37.     In additional marketing material, under the heading "Striker Safety," defendant further states: the striker safety "[p]revents the striker from being released unless the trigger is pulled."

38.     At the same time, SIG SAUER contradictorily stated in the original owner's manual for the P320, on page 25, that the weapon could fire if dropped without the trigger being pulled if a round were "chambered," i.e., inside the firing chamber of the weapon's slide.

39.     It is standard operating procedure for all U.S. law enforcement agencies, local police departments, and the military, at a commander's discretion, to carry pistols with a chambered round.

40.     SIG was aware of the latter fact at the time it designed and manufactured all its pistols, including the P320.  The P320 is the first striker-fired pistol[1] it has ever manufactured. SIG assembled the P320 using the same frame from an earlier hammer-fired SIG model, the P250.

41.     While competing for a $580 million contract to supply the United States Army with a new service pistol in 2016, SIG's prototype P320s exhibited nearly 200 malfunctions during Army testing.  The army demanded that SIG fix all problems associated with the prototype.

42.     On or about May 10, 2017, the United States Army submitted an urgent engineering change proposal for the prototype P320, which essentially demanded that its entire internal firing system be replaced.  SIG complied and made all requested changes to the Army

---

[1] A striker-fired pistol is different from the traditional "hammer-fired" pistol.  It contains no external hammer to be pulled back by the user; rather, it has an internal "striker" that is held back under spring pressure inside the gun, like a bow and arrow. Once the slide is forcibly moved or "racked" backward, the weapon is fully cocked and in "condition zero," ready to fire.  The striker is now under significant spring tension to move forward and strike the round's primer. The striker is held back the weapon's sear.  In the below illustrative photo of a typical striker-fired pistol the striker, in red, is held back by the sear, in blue.



version of the weapon.  Meanwhile, SIG permitted approximately 500,000 P320s to be used by

United States law enforcement and civilians alike.

43.     Sometime after January 2017, when a Connecticut law enforcement agent was

shot by a P320 that fell to the ground from less than three feet, SIG removed the warning on page

25 from the user manual regarding a chambered round, and replaced it with the following language:



All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to fail to work as designed. After suspected exposure to these conditions, have the firearm checked by a certified armorer before using. Mechanical safeties are designed to augment, and not replace safe handling practices.**Careless and improper handling of any firearm can result in unintentional discharge.**

(emphasis in original).

44.     Defendant, SIG had never before represented that mere "vibration" could cause

the weapon to discharge.  Upon information and belief, no other firearms manufacturer has ever

made such a representation.

45.     In a 2016 amendment to the user manual, moreover, SIG warned users not to

lubricate the striker inside the gun, a normal part of the process of the cleaning and maintenance

of any semi-automatic firearm. The striker, as noted, is held back while under spring pressure by

and rests, in the P320, in tenuous contact with a small piece of metal inside the gun called the

"sear."

46.     Since the P320's manufacture and distribution into the stream of commerce, SIG

has expressly represented that the weapon possessed a "robust safety system":



47.     In fact, SIG's original design and manufacture of the P320 rendered the weapon unreasonably dangerous for its intended uses and for any foreseeable uses, including normal carrying, holstering, un-holstering, and/or rough handling in an altercation or combat.  This was true at the time SIG sold Officer Colwell's P320 to the Troy Police Department.

48.     Specifically, the P320 was equipped with an inadequate sear-striker connection (even after implementing a "voluntary upgrade" program for the gun), an inadequate internal striker safety, and no external safety or tabbed trigger safety.

49.     When SIG shipped P320s to the Troy Police Department, and thousands of others across the country, SIG knew or should have known, that the weapon was defective in its design and unreasonably dangerous for its ordinary uses, intended uses, and all other foreseeable uses and un-commanded discharges that could occur in the ordinary course of using the weapon.

50.     Before SIG shipped the first P320s to the Troy Police Department, SIG was aware of other, prior un-commanded discharges of the P320 platform, and other SIG pistols, many of which pre-dated the sale to the Troy Police Department.

51.     Upon information and belief, there have been many prior incidents of unintended discharges involving SIG weapons, both hammer-fired and striker-fired, that have discharged without the trigger being pulled, or simply while being handled, accidentally dropped, or while being holstered.

52.     In 2015, a Pennsylvania State Trooper and firearms instructor killed another trooper with his SIG Sauer pistol when it discharged without a trigger pull while conducting safety training.

53.     In 2016, a tactical response training instructor near Sacramento dropped his SIG Sauer, firing a bullet into a student's truck.

54.     In the period between 2012 and 2015, the New York City Police Department reported 10 un-commanded discharges involving Sig Sauer weapons.

55.     In February 2016, a fully-holstered P320 discharged without a trigger pull inside a Roscommon, Michigan Police Officer's vehicle when the officer moved to exit the vehicle during a snowstorm.   The incident was captured on the Officer's body cam video and shows that no object entered inside his holster at any time.

56.     In 2016, the Surprise, Arizona Police Department complained to SIG of two separate incidents of P320s firing without trigger pulls.

57.     These latter three incidents were not disclosed by SIG, despite long outstanding discovery requests in two separate federal proceedings, until the last day of discovery in the second proceeding in early 2019.

58.　　　In October 2016, a P320 fired un-commanded on retired NYPD Officer Thomas Frankenberry in South Carolina, severely injuring him. The spent casing did not eject.

59.　　　In November 2016, a P320 fired un-commanded on an Officer in Holmes Beach Florida, striking him in his leg.

60.　　　In 2017, a Sheriff's Deputy in Michigan's SIG Sauer pistol discharged without a trigger pull, striking a schoolteacher in the neck.

61.　　　On January 5, 2017, a P320 shot a Stamford SWAT team member in his left knee when the pistol fell from a distance of less than three feet to the ground while fully holstered, refuting SIG's express representations that the weapon is drop safe, cannot fire without a trigger pull and does not require a safety to be drop safe.

62.　　　On February 28, 2017, a P320 discharged without a trigger pull while in use by the University of Cincinnati Police Department.

63.　　　On June 14, 2017, a P320 discharged without a trigger pull in Wilsonville, Oregon.

64.　　　On June 20, 2017, a P320 discharged without a trigger pull while in use by the Howell Township, New Jersey Police Department.

65.　　　In June of 2017, SIG shipped approximately 800 P320s to the Loudoun County Sheriff's Department, privately assuring its leadership, Sheriff David Chapman that the problems with the weapon would be fixed, but that for the time being it had to deal with the weapon as currently manufactured and designed.[2]

66.　　　On July 28, 2017, a P320 discharged without a trigger pull in Tarrant County, Texas.

---

[2]　　　As noted *infra*, both a non-upgraded and "upgraded" version of these P320s later fired un-commanded on and hit at least two Loudoun County deputy sheriffs in 2018 and 2019.

67.     On August 4, 2017, the Stamford SWAT team member sued SIG in U.S. District Court in Connecticut for an un-commanded discharge of a commercial version of the P320 that shot him in his knee.

68.     Four days later, SIG's CEO released a statement stating: "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market."

69.     This statement was false, in view of SIG's knowledge that Officer Sherperis in Connecticut had been shot by a drop fire some eight months earlier with the commercial version of the P320, and that several other un-commanded discharges of the P320 had occurred before that date.

70.     On August 8, 2017, SIG announced a "voluntary upgrade" program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies" and all "U.S. standard for safety."

71.     This statement was also false, as there are no federal government standards for gun safety, a fact known to SIG when it issued this press release.

72.     No federal agency oversees how firearms are designed or built. Firearms were expressly exempted by Congress from any federal regulation when it created the Consumer Product Safety Commission in 1972.

73.     SIG's "upgrade" program, which was presented to the public as purely optional, not urgent, and not mandatory, offered to mark existing commercial versions of the P320 "better" by installing a much lighter trigger, and internal disconnect switch, an improved sear to prevent un-commanded discharges.

74.     On August 9, 2017, the Police Chief of Morrow, Georgia issued and emergency order removing the P320 from service.

75. In October 2017, a P320 discharged without a trigger pull in Georgia when an officer fell to the ground in pursuit of a suspect. His weapon was holstered and fired simply when he struck the ground.

76. On November 12, 2017, a P320 discharged without a trigger pull in Dallas County, Texas.

77. On February 2, 2018, Tyler Herman of McCloud, Oklahoma was removing a holster containing his P320 from his belt. While in the process of removing the holster, and without him touching the trigger, Herman's P320 discharged, striking Herman and causing catastrophic injuries.

78. On February 7, 2018, Loudoun County, Virginia Deputy Sheriff Marcie Vadnais's P320 fired on her un-commanded in Virginia, severing her right femur causing catastrophic skeletal injury, deformity, three general anesthesia surgeries, severe emotional distress, and related trauma, ending her career. Upon CAT scanning her P320, it was found to have both a design and manufacturing defect: crossed sear springs that apply upward spring pressure to the sear to keep it from releasing the striker.

79. Months later in April 2018, SIG issued a second "voluntary upgrade" notice to all users or owners of the P320, but still did not recall the weapon.

80. In May 2018, civilian Gunter Walker reported to SIG that his P320 fired on him un-commanded when he placed the weapon down on his nightstand, shooting him through the palm of his left hand.

81. In June 2018, a Williams County, Ohio Officer reported that his P320 discharged twice in one moment as he was merely attempting to move the slide backward. One round grazed the Officer's arm; the other blew through his patrol car's driver's side door.

82.    In May 2018, a Rancho Cucamonga, California Officer reported that his P320 fired un-commanded merely while he was walking inside his department locker room; the casing of the round did not eject.

83.    In October 2018, a P320 fired un-commanded on Lieutenant Letrell Hayes in Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf.

84.    In October 2018, firearms and retired Law Enforcement Officer Stephen Mayes' P320 fired un-commanded while seated in its holster, causing severe injury to his right leg.

85.    In December 2018, civilian Robert Lang's P320 fired on him un-commanded and caused serve tunneling wounds to this right leg.

86.    On May 19, 2019, the P320 of Lieutenant Thomas Ahern of the Cambridge, Massachusetts SWAT team fired un-commanded inside a SWAT van with six other occupants while he was working a shift for the annual MayFair event near Harvard Square.

87.    The round struck a cellphone case on Ahern's left leg, deflected into a SWAT gear bag and came to rest in a ballistic helmet, narrowly missing everyone else in the van. The casing of the round did not eject. Lieutenant Ahern is a SIG certified armorer[3] on the P320.

88.    Only July 23, 2019, a P320 fired un-commanded on Officer Walter Collete, Jr. of the Somerville, Massachusetts Police Department hitting him in his leg and causing substantial injuries to his leg.

---

[3] According to SIG Sauer documents, "[t]he SIG SAUER factory armorer certification enables the agency armorer or individual user to completely disassemble, inspect, service, and re-assemble associated weapon systems without voiding the factory warranty. Proper and routine weapon maintenance and inspection of a firearm are essential to ensure maximum reliability. Factory armorer courses at SIG SAUER Academy certify agency armorers or individuals to maintain, inspect, service, and repair selected SIG SAUER firearms while preserving the factory warranty. Upon successful completion, armorers will fully understand each firearm and be factory-certified for a period of three years." https://www.sigsaueracademy.com/course/armorer-certification

89.     In August 2019, a Philadelphia Transit Officer's P320 fired un-commanded while fully-holstered, nearly striking a bystander in the subway. The incident was captured on video, and the officer was returned to duty the next day.

90.     The transit authority replaced all SIG P320s, and later fully exonerated the officer of any alleged wrongdoing in view of the content of the videotape of the incident showing that it fired without a trigger pull. The officer, Craig Jacklyn, later stated:

> This weapon is a hazard. I actually spoke with a lawyer for my situation. Although No one was hurt...someone could have been killed. I'm angry that I was put in a potentially life altering position with a product deemed "safe" by its manufacturer. The fact that officers are carrying this weapon on the job and at home around family thinking it's safe even while resting in its holster has me very angry. Everything that I've told you is documented through 2 Investigative Services. Philadelphia Police Firearms Investigative Unit/ Officer Involved Shooting Incident Unit and SEPTA Transit Police Criminal Investigations Unit. There is station video footage/ body worn camera footage as well.

91.     On September 3, 2019, another P320 in use by the Loudoun County Virginia's Sheriff's Office fired un-commanded on another Loudoun County Deputy Sheriff, Carl Costello, hitting in his leg.

92.     On October 10, 2019, Officer Jacques Desrosiers, also of the Cambridge, Massachusetts Police Department, was shot by his P320 without a trigger pull. The round caused massive and life-changing injuries to Officer Desrosiers. The spent casing of the round did not eject.

93.     On October 11, 2019, a P320 fired un-commanded on Veterans Affairs Police Officer Frank J. Kneski, striking him beneath his lower back as he was un-holstering the weapon. Upon inspection it was found that the spent casing did not eject.

94.     The Kneski discharge was investigated by Major Peter J Villani of the Veterans Affairs Police Agency, also a SIG certified armorer on the P320. In his report he noted the following:

>       After reviewing the Officer's sidearm, it was noted that the P-320 came from Sig Sauer to the distributor prior to the point of sale already with the "upgrade" completed. The sidearm had approximately 100 rounds through it since purchased. Upon further examination of the internal parts of the frame module, I noticed that the foot of the striker that catches the [sear] has noticeable side to side and up and down movement within its channel along with upward movement of the slide from the frame. Also, the edge of the striker foot which has a height thickness of approximately 2mm, is only making contact with approximately .25 of a mm of the leading edge only of the disconnector hook. Since the striker has been changed with a lighter weight version during the "upgrade program", it is quite possible that any abrupt movement or twisting of the P-320 while holstered, could cause the foot of the striker to disengage itself from the disconnector hook on its own since there is so little contact between the striker foot and the [sear].

95.     On November 9, 2019, a P320 fired un-commanded on Officer Matthew Gardette of the Manteca, California Police Department as he was getting ready for work. As he merely attempted to place and fasten his duty belt around his waist, the P320 discharged inside the holster.

96.     The holster was a Safariland level three retention holster with a hood securing the pistol. The round blew out the bottom of the holster, impacted the locker room floor, and missed both Officer Gardette and fellow officers by inches as it ricocheted into a locker door.

97.     On December 2, 2019, a P320 fired un-commanded while in the possession of Detective David Albert, also of the Cambridge, Massachusetts Police Department, as he was in the process of putting his duty belt on.

98.     Upon information and belief, employees at SIG Sauer's own training academy in New Hampshire have admitted to un-commanded discharges causing injury in both 2016 and 2017.

99.     On February 27, 2020, Tampa Polce Department Reserve Office Howard Northrop was severely and permanently injured when his service-issued P320 discharged without a trigger pull, while inside his service-issued holster.

100.    Northrop was struck in the left leg by a 9mm hollow-point bullet, which mushroomed and caused massive internal damage.

101.    On September 21, 2020, a P320 fired un-commanded while in the possession of Deportation Officer Keith Slatowski, of Immigration and Customs Enforcement during a training exercise in New Castle, Delaware.

102.    Slatowski's P320 fired while in its holster, and the casing did not eject.

103.    Slatowski was severely wounded and has not been able to return to duty since the accident as of the date of this filing.

104.    On December 8, 2020, a P320 fired un-commanded while in the possession of Deportation Officer Catherine Chargualaf, of Immigration and Customs Enforcement during a training exercise in Mt. Juliet, Tennessee.

105.    Chargualaf's P320 fired while in its holster, striking her in the right hip.

106.    On May 12, 2021, Department of Homeland Security Special Agent Amy Hendel was shot in the right upper thigh when her holstered P320 discharged without a trigger-pull.

107.    To date, SIG has never issued a mandatory recall of the P320 for repairs; though it has done so in the past for other of its products with far lesser sales.

108.    In an interview in 2013, SIG's former Chief Financial Officer, Timothy Scullin, just before the P320 was brought to market in 2014, noted that SIG's revenue had risen approximately 1,400 percent from 2012 to 2013. He further stated that SIG Sauer's growth has outpaced the firearms' industry's growth by "two or three times."

109.     When asked what some of his biggest professional challenges he has faced in his

career, he stated:

> At SIG, to grow this fast, people get really challenged.  When you're growing
> 70 to 80 percent in a year, all the systems get stretched, and the people really get
> stretched.   You have to be able to manage multiple tasks in a very fast
> environment, and in an environment that's highly regulated, so you can't mess
> up, otherwise you get shut down.  It just creates a tremendous of stress on the
> people in the system. But we've got people that have risen to the  challenge.

## COUNT I

## STRICT PRODUCT LIABILITY

110.     Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set

forth herein.

111.     SIG, by and through its agents, servants, workers, contractors, designers,

assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A)

of the Restatement (Second) of Torts because:

a.   SIG is engaged in the regular business of designing, assembling, manufacturing,
selling, supplying, distributing, and/or placing into the stream of commerce
firearms, including the P320 that injured Plaintiff;

b.   The product involved in the subject incident was marketed and/or placed in the general
stream of commerce by SIG;

c.   The product was expected to and did reach users without substantial change in the
condition in which it was designed, assembled, manufactured, sold, supplied,
distributed and/or placed into the stream of commerce;

d.   The product was designed, assembled, manufactured, sold, supplied, distributed,
and/or placed into the stream of commerce in the defective condition for the reasons
set forth above.

112.     The P320 was in a defective condition as: (1) the danger contained therein was

unknowable and unacceptable to the average or ordinary consumer; and/or (2) a reasonable person

would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

113.   SIG breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

114.   The defective condition of the P320 caused Plaintiff's injuries.

115.   SIG is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against the Defendant, SIG, Sauer, Inc., for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT II

## NEGLIGENCE

116.   Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

117.   At all relevant times, SIG owed Colwell the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

118.   At all relevant times, SIG owed Colwell the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

119.   At all relevant times, SIG owed a duty to unambiguously warn consumers and/or intended users of the P320, including Colwell, of known or suspected defects that rendered the

gun unreasonably dangerous to handle or use. Upon information and belief, SIG knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

120.   SIG breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.     By failing to use due care in designing and manufacturing the P320's firing and striker assembly so as to prevent un-commanded discharges;

ii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges;

iii.   By failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

iv.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

v.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Colwell, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vi.    By failing to discover the defective, hazardous and unreasonably dangerous  conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

vii.   By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the

user manual for the gun after several incidents of un-commanded discharges;

viii.   Other negligent acts and omissions to be developed in the course of discovery.

121.   SIG knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

122.   The gun's defective condition was not visible and Colwell was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

123.   SIG's negligence, as alleged in this Count, directly and proximately caused the June 2, 2021 un-commanded discharge and Colwell's injuries resulting from the accident.

124.   As a direct and proximate result of the negligence set forth in this Count, Colwell suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Colwell will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against the Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

125.     Plaintiffs readopt and re-allege all paragraphs of this pleading as if fully set forth herein.

126.     At all relevant times, SIG was in the business of marketing, selling, and distributing weapons, including the gun causing Colwell's injuries.

127.     SIG knew of the ordinary purposes for which the gun was intended and impliedly warranted it to be of merchantable quality, safe, and fit for such purposes (which included "vibrated" and handled while situated within and without a holster) and all other reasonably foreseeable uses.

128.     At all relevant times, Colwell used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of SIG. SIG breached the above-referenced implied warranties as to the gun because, at the time it left SIG's possession, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes for which it was intended and its reasonably foreseeable misuses by virtue of:

> i.     Failing to use due care in designing and manufacturing the P320's internal components, including its sear-striker connection, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges;
>
> ii.     Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;
>
> iii.     Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

    iv.    Negligently failing to unambiguously warn purchasers and end users of the gun, including Colwell, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

    v.    Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

    vi.    Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

129.    Colwell, as the end user of the gun, was a person who would foreseeably be injured by breaching the implied warranty referenced in this Count and SIG's breach of the warranty of merchantability as alleged herein directly and proximately cause the accident and Colwell's injuries.

130.    As a direct and proximate result of the breaches set forth in this Count, Colwell suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Colwell will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against the Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT IV

## BREACH OF EXPRESS WARRANTY

131.     Plaintiffs readopt and re-allege all paragraphs of this Complaint as if fully set forth herein.

132.     At all times material hereto, SIG was in the business of marketing, selling, and distributing weapons, including the gun causing Colwell's injuries. Upon information and belief, SIG knew or had reason to know the gun would be situated in a holster during the normal and foreseeable course of a law enforcement officer's activity, and that the purchaser was in fact relying on SIG's skill, judgment, and implied warranty of the gun's fitness for that particular purpose without firing.

133.     Accordingly, SIG impliedly warranted that the gun was suitable for the particular purpose of being situated within a holster during the normal and foreseeable course of a law enforcement officer's activity.

134.     At all relevant times, Colwell used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of SIG in using and handling the gun.

135.     SIG breached the above-referenced implied warranty as to the gun in that it was unreasonably dangerous at the time it left SIG's possession by virtue of:

    i.   Failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges;

    ii.  Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

iii. Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

iv. Negligently failing to unambiguously and conspicuously warn purchasers and end users of the gun, including Colwell, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

v. Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

vi. Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

vii. Expressly warranting that the gun would not fire unless the trigger was pulled.

136.    A direct and proximate result of the breaches set forth in this Count, Colwell suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Colwell will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against the Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT V

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

137.     Plaintiffs readopt and re-allege all paragraphs of this Complaint as if fully set forth herein.

138.     By its actions, SIG knew or should have known that the design and/or manufacturing defect in the gun rendered it capable of discharging without the trigger being pulled. Instead, SIG presented to the City of Troy Police Department and Colwell, and the general public, in marketing materials that numerous safeties would prevent the gun from firing unless the trigger was pulled.

139.     SIG's conduct created an unreasonable risk of causing the Plaintiff emotional distress.

140.     Colwell's emotional distress was foreseeable.

141.     The emotional distress was severe enough that it might result in illness or bodily harm, and in fact did result in severe bodily harm; including severe damage to his right leg.

142.     SIG's conduct was the direct and proximate cause of Colwell's distress.

143.     The trigger was not pulled by Colwell, yet the weapon still fired and shot him in the leg, narrowly missing his femoral artery, which would have been a mortal injury.

144.     As a direct and proximate result of the breaches set forth in this Count, Colwell suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care

expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Colwell will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against the Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## <u>COUNT VI</u>

## <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

145.    Plaintiffs readopt and re-allege all paragraphs of this Complaint as if fully set forth herein.

146.    Upon information and belief, SIG had knowledge of the various defects with the commercial version of the P320 gun years before Colwell was shot on June 2, 2021.

147.    Despite having such knowledge, it failed to issue a mandatory recall of the gun despite the ability to do so, which would have prevented the severe injury to Colwell.

148.    Had SIG acted responsibly, repairing the defects in the commercial version of the P320 before June 2, 2021, Colwell never would have been shot.  The round discharged from Officer Colwell's weapon easily could have taken his life.

149.    SIG knew or should have known that severe emotional distress was a likely result of its outrageous and irresponsible conduct--conduct intended to save SIG millions in repair costs--by implementing a "voluntary upgrade" of the gun instead of a mandatory recall.

150.    SIG's conduct in this matter was self-serving, deceptive, reckless, intolerable and outrageous as described above, such as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community.

151.    SIG's conduct was the direct and proximate cause of Colwell's distress.

152.    The emotional distress sustained by Colwell was severe and was accompanied by severe and permanent physical injury.

153.    As a direct and proximate result of the breaches set forth in this Count, Colwell suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for care and treatment. These injuries are either permanent or continuing in their nature and Colwell will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT VII

## LOSS OF CONSORTIUM

154**.**    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

155.    At all relevant times hereto, Plaintiff, Julia Colwell, was the lawfully wedded wife of husband-plaintiff, Michael Colwell, with whom she lives.

156.    As a result of the injuries sustained by Plaintiff, Michael Colwell, wife-plaintiff Julia Colwell, has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, Plaintiff, Michael Colwell, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, Julia Colwell, demands judgment in her favor and against

Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

Respectfully submitted,

**PBS LEGAL, LLC**

By: */s/ Paul B. Sherr*
      PAUL B. SHERR
      Bar ID No. 2872612
      8 John Street
      Nassau, New York 12123
      (518)-766-4090 (Telephone)
      (518)-931-0168 (Facsimile)
      *Attorney for Plaintiff*

**SALTZ MONGELUZZI & BENDESKY P.C.**

BY: */s/ Robert W. Zimmerman*
      LARRY BENDESKY
      ROBERT W. ZIMMERMAN
      DANIEL L. CEISLER
      PA Bar ID Nos. 51026/208410/326798
      Pro Hac Vice applications pending
      One Liberty Place, 52nd Floor
      1650 Market Street
      Philadelphia, PA  19103
      (215) 496-8282 (Telephone)
      (215) 496-0999 (Facsimile)
      lbendesky@smbb.com
      rzimmerman@smbb.com
      dceisler@smbb.com

**LAW OFFICES OF JEFFREY S. BAGNELL**

BY: */s/Jeffrey S. Bagnell*
      Jeffrey S. Bagnell
      CT Bar ID No. 408159
      Pro Hac Vice application pending
      55 Post Road West
      Westport, Connecticut 06880
      (203) 984-8820 (Telephone)
      (203) 255-4454 (Facsimile)
      jeff@bagnell-law.com

**GURNEY LAW, PLLC**

By: ___*/s/ Nicholas S. Gurney*_____

NICHOLAS S. GURNEY
Florida Bar No. 125013
Pro Hac Vic application pending
1238 E. Concord St.
Orlando, Florida 32803
(407) 554-5757 (Telephone)
(407) 543-6543 (Facsimile)
*Service Email:* *service@gurney.law*
*Alternate Email:* *nick@gurney.law*

***Attorneys for Plaintiff***